UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

SCOTT HALFMANN,

                            Plaintiff,                **COMPLAINT AND DEMAND FOR A JURY TRIAL**

        -v-                                                   **<u>12-CV-1403 (PAC)</u>**

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") WILLIAM CLEMENS,
Shield No. 27264; SUPERVISORY OFFICER JOHN
DOE 1, P.O. JOHN DOE 2 through P.O. JOHN DOE 5
(the name John Doe being fictitious, as their true
names and shield numbers are presently unknown), in their
individual and official capacities,

                            Defendants.

------------------------------------------------------------------------x

        Plaintiff SCOTT HALFMANN, by his attorneys DAVID B. RANKIN and ROBERT M. QUACKENBUSH of Rankin & Taylor, PLLC, as and for his complaint, does hereby state and allege:

## <u>PRELIMINARY STATEMENT</u>

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff SCOTT HALFMANN's rights were violated when officers of the New York City Police Department ("NYPD") unconstitutionally and without any legal basis arrested him in retaliation for giving a speech near the September 11, 2011 Memorial, a speech which questioned the United States' Government's official explanation for the events of that tragic day and advocated for a new, thorough investigation into those attacks.

**3.** Plaintiff's speech was given in the middle of a pedestrian roadway which was at least 55 feet wide, thereby allowing ample space for pedestrian traffic to pass by him without disruption or obstruction.

**4.** Nonetheless, upon hearing the contents and viewpoint contained in plaintiff's speech, police officers arrested him upon the knowingly false pretense he was blocking pedestrian traffic.

**5.** The individual defendants then repeatedly and baselessly denied plaintiff access to a telephone to notify his wife of his arrest, access which is required by New York Criminal Procedure Law ("NYCPL") § 140.20(7), thereby causing damages and violating plaintiff's substantive and procedural due process rights under the Federal Constitution.

**6.** As a result of the officers' conduct, plaintiff was held in custody for several hours and subsequently prosecuted for disorderly conduct, a prosecution which was terminated in plaintiff's favor after two court appearances.

**7.** Plaintiff also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

**8.** This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of plaintiff's rights under the First, Fourth, Fifth and Fourteenth Amendments to the Federal Constitution.

**9.** Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that plaintiff's claim arose within the confines of the Southern District of New York.

**10.** An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

**11.** Plaintiff SCOTT HALFMANN is, and was at all times relevant to this action, a resident of the County of Westchester in the State of New York.

**12.** Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force, as well as the employment of police officers, as said risks attach to the public consumers of the services provided by NYPD.

**13.** Defendants New York City Police Department Officer ("P.O.") WILLIAM CLEMENS (Shield No. 27264), SUPERVISORY OFFICER JOHN DOE 1 and P.O. JOHN DOE 2 through P.O. JOHN DOE 5 (referred to collectively as the "individual defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD. The individual defendants are being sued herein in their individual and official capacities.

**14.** At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of NYPD and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

**15.** The true names, ranks, and shield numbers of defendants SUPERVISORY OFFICER JOHN DOE 1 and P.O. JOHN DOE 2 through P.O. JOHN DOE 5 are not currently known to the

plaintiff. However, all of those defendants are employees or agents of the NYPD. Accordingly, those defendants are entitled to representation in this action by the New York City Law Department ("Law Department") upon their request, pursuant to General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that plaintiff intends to name those officers as defendants in an amended pleading once their true names and shield numbers becomes known to plaintiff and (b) that the Law Department should immediately begin preparing their defense in this action.

16. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for plaintiff's rights.

17. At all relevant times, the individual defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

### FACTS SPECIFIC TO PLAINTIFF'S INTEREST IN A NEW INVESTIGATION INTO THE EVENTS OF SEPTEMBER 11, 2001

18. Like millions of New Yorkers, plaintiff has a personal connection to the events of September 11, 2001.

19. Plaintiff's father worked in a 15th floor office inside the South Tower of the World Trade Center for nearly thirty years prior to September 11, 2001. On that day, plaintiff's father was on his office telephone with his wife when United Airlines Flight 175 crashed into the building.

20. After making his way down the crowded stairwell, plaintiff's father emerged in the lower lobby and was directed toward the lower shopping entrance by security personnel.

21. Soon thereafter, plaintiff's father emerged on Church Street and walked through the dust and debris clouds to the 4-train entrance at the Brooklyn Bridge.

22. Plaintiff watched the events of that day unfold on television from São Paulo, Brazil. Knowing his father worked in the South Tower, he tried desperately to reach his family by telephone, but he was unable to make a connection until late in the evening when he learned his father had survived.

23. Plaintiff's personal connection to and observations of the events of that day fueled his desire to learn the full truth about the attacks.

24. As such, plaintiff believes the government, as well as independent nongovernmental agencies, should conduct a new investigation into the events of September 11, 2001 in an attempt to learn the full truth about what happened on that day.

25. In furtherance of this belief, plaintiff publicly advocates for such an investigation to occur.

FACTS SPECIFIC TO THE CEREMONY DEDICATING THE SEPTEMBER 11 MEMORIAL ON SEPTEMBER 11, 2011

26. September 11, 2011, was the ten-year anniversary of the attacks on the World Trade Center.

27. On that date, hundreds of people gathered inside and around the site of the World Trade Center for the commemoration and dedication of the September 11 Memorial ("Memorial") in Lower Manhattan.

28. As a result of that special event, Church Street was closed to vehicular traffic for several blocks north of the World Trade Center, including the area on Church Street between the Memorial site and Barclay Street.

29. As such, at all relevant times herein, the Church Street roadway was exclusively being used as a pedestrian walkway for people entering and leaving the Memorial.

30. Church Street is a road than runs one way, north, between Vesey Street and Canal Street, and it is wide enough to accommodate three entire lanes of traffic and two parking lanes on either side of the road. As such, Church Street is approximately 55 feet wide, not including the sidewalks on both sides of the road.

31. On or about September 11, 2011, organizers of the ceremony in the Memorial erected a large movie screen near the intersection of Trinity Place and Fulton Street, thereby allowing people gathered on Church Street to watch the ceremony without actually entering the Memorial itself.

### FACTS SPECIFIC TO PLAINTIFF'S UNLAWFUL ARREST AND FAILED PROSECUTION

32. The events described herein occurred principally on Church Street between Vesey Street and Barclay Street in the County of New York, on September 11, 2011, at approximately 1:30 pm and thereafter.

33. As he had done in the past, plaintiff traveled from Westchester County into Manhattan on September 11 to participate in annual memorials related to the attacks on the World Trade Center. Plaintiff attends these memorials in order to remember and honor the victims and heroes of that day.

34. Plaintiff also attends these memorials to participate in activities surrounding the investigation of what happened on September 11, 2001, with the hope of gaining public support for a new investigation into the attacks on the World Trade Center.

35. Plaintiff arrived in the area near the Memorial between 9:00 am and 10:00 am on September 11, 2011.

36. Plaintiff's wife also traveled from Westchester County to attend the Memorial ceremony, although she took a train that departed several hours later than plaintiff's train.

**37.** After plaintiff passed through the security perimeter around the Memorial, he stood on Church Street, between Barclay Street and Vesey Street, immediately in front of the Federal building located at 90 Church Street.

**38.** At approximately 1:30 pm, the ceremony ended and the movie screen faded to blue.

**39.** Over the next thirty to forty-five seconds, people on Church Street who were watching the ceremony began to turn around, away from the Memorial, and started walking north towards plaintiff's location in the middle of Church Street in front of the Federal building.

**40.** Plaintiff intended to give a speech, after the Memorial ceremony ended, urging the public to support a new, thorough investigation into the attacks of September 11, 2001. In support of his speech, he held in his hand a copy of an article published in The Open Chemical Physics Journal entitled *Active Thermatic Material Discovered in Dust from the 9/11 World Trade Center Catastrophe.*

**41.** As people began to walk past his location on Church Street, plaintiff gave the following speech:

> People of New York, when will we be allowed to know the truth about 9/11? When will we be allowed to investigate 9/11? This paper has proven scientifically that evidence of thermite bombs has been found in the dust of the World Trade Center. When will we be allowed to investigate properly the crime that was committed here? When will we be allowed to honor the victims and heroes of 9/11 by finding out who did it?

**42.** Just as plaintiff was finishing the last sentence, defendants P.O. CLEMENS and SUPERVISORY OFFICER DOE 1 grabbed plaintiff from behind and whisked him away from the area.

**43.** Prior to the officers grabbing plaintiff, pedestrian traffic freely flowed past plaintiff without any obstruction.

    **a.** Church Street is approximately 55 feet wide.

    **b.** Approximately eight feet of sidewalk were available for pedestrian traffic on either side of Church Street at this time, meaning a total of 71 feet of street and sidewalk were available for pedestrian traffic.

    **c.** Plaintiff's shoulders are approximately two feet wide.

    **d.** Accordingly, plaintiff was using approximately 2.8% of the width of the usable pedestrian walkway when he was arrested.

**44.** At no time prior to grabbing plaintiff did any police officer tell plaintiff he was blocking pedestrian traffic or otherwise being disorderly. Likewise, prior to his arrest, no police officer gave plaintiff any order to disperse or lower his voice.

**45.** As the officers walked with plaintiff, they were joined by defendants P.O DOE 2 and P.O DOE 3 who surrounded plaintiff and escorted him north on Church Street and about a half-block west on Barclay Street to an area not open to the general public.

**46.** While being escorted up Church Street and onto Barclay Street, plaintiff continued making his speech since none of the officers had told him to be quiet or otherwise lower his voice.

**47.** Once on Barclay Street, the officers walked plaintiff towards a marked NYPD vehicle, and then they released their collective grips on him.

**48.** Since the officers no longer had their hands on plaintiff, and since the officers had never informed plaintiff he was under arrest, plaintiff assumed he was free to leave. As such, when the officers took their hands off plaintiff, he began to walk away.

**49.** When plaintiff began to walk away, though, one or more of the individual defendants grabbed him again and informed him he was under arrest.

**50.** The individual defendants then placed plaintiff in handcuffs and held him on Barclay Street for approximately 40 minutes.

**51.** Thereafter, the individual defendants handed plaintiff off to another team of officers, who then put plaintiff in a police vehicle and took him to a nearby precinct.[1]

**52.** The officers detained plaintiff within the precinct for several hours.

**53.** Before being released from custody, plaintiff was issued a criminal court summons, sworn to by defendant P.O. CLEMENS charging him with violating New York Penal Law § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic.

**54.** The officers released plaintiff from custody at approximately 6:00 pm on September 11, 2011.

**55.** Accordingly, plaintiff was in defendants' custody for approximately four and one-half hours.

**56.** Plaintiff appeared in criminal court on December 1, 2011 to defend himself against the charge of disorderly conduct. There, plaintiff pled not guilty and requested a trial date.

**57.** On February 6, 2012, the date scheduled for plaintiff's disorderly conduct trial, defendant P.O. CLEMENS declined to show up in the criminal court to testify as the complainant.

**58.** Accordingly, the criminal court dismissed the charge against plaintiff on two separate grounds: the accusatory instrument was facially insufficient to support the charge of disorderly conduct, and the government's failure to prosecute.

**FACTS SPECIFIC TO THE DENIALS OF ACCESS TO A TELEPHONE WHILE PLAINTIFF WAS IN POLICE CUSTODY**

**59.** Plaintiff was arrested before he met up with his wife at the Memorial site, as he had previously planned to do.

**60.** When plaintiff was arrested and placed in the police vehicle, he managed to slip his cell phone out of his back pocket to call his wife. Just as plaintiff was about to get his wife on the line, defendant P.O. DOE 4 opened the door to the vehicle, took the phone away from plaintiff, and told him, in sum and substance, "NO CALLS ALLOWED."

---

[1]    Upon information and belief, the officers took plaintiff to the First Precinct, located at 16 Ericsson Place.

**61.** Plaintiff attempted to explain to this officer that he needed to speak to his wife, but the officer hung up the phone and took it into his own custody.

**62.** While still in the police car, plaintiff asked this officer and defendant P.O. CLEMENS several times if he could use the telephone to call his wife, and they responded, in sum and substance, that plaintiff could not make a phone call until he got to the precinct.

**63.** Upon arrival at the precinct, defendant P.O. DOE 4 put plaintiff's phone into plaintiff's backpack, but the officer did not allow plaintiff to use it.

**64.** While plaintiff was standing before the desk officer, defendant P.O. DOE 5, plaintiff could hear his phone ringing continuously, calls which he correctly believed were coming from his wife in an attempt to learn of his whereabouts.

**65.** Plaintiff asked defendant P.O. DOE 5 whether he could answer the phone or make a call.

**66.** Defendant P.O. DOE 5 responded by telling plaintiff, in sum and substance, that a phone call would be would be arranged but that plaintiff had to wait.

**67.** Plaintiff was placed in a holding cell, and his backpack was placed nearby. From inside the cell, plaintiff could hear his phone continuously ringing and vibrating, but defendant P.O. CLEMENS refused to allow him to answer the phone or make a phone call.

**68.** About an hour later, defendant P.O. CLEMENS told plaintiff he had received permission from a superior officer to allow plaintiff to make a phone call. Defendant P.O. CLEMENS escorted plaintiff to a nearby phone, but the phone was non-functional and plaintiff was unable to make a call from that phone despite at least four separate attempts.

**69.** When plaintiff asked for clarification from defendant P.O. CLEMENS about how to use the phone, the officer responded, in sum and substance, that the phone probably didn't work.

**70.** Defendant P.O. CLEMENS then took plaintiff back to the holding cell, where he remained for approximately another two hours.

**71.** Plaintiff was not able to make a phone call until he was released from custody.

**72.** At no time was plaintiff provided notice and an opportunity to be heard regarding the refusals to allow him meaningful access to a telephone.

**FIRST CLAIM FOR RELIEF**
**FALSE ARREST AND FALSE IMPRISONMENT**
**FOURTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

**73.** Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**74.** By the actions described above, defendants caused to be falsely arrested or falsely arrested plaintiff, without reasonable or probable cause, illegally and without a warrant, without any right or authority to do so, and under the color of law. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his rights under the Fourth and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

**75.** As a result of the foregoing, plaintiff was deprived of his liberty, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**SECOND CLAIM FOR RELIEF**
**MALICIOUS PROSECUTION**
**FOURTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

**76.** Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

**77.** By the actions described above, by the false and insufficient allegations against the plaintiff in the accusatory instrument, the individual defendants caused a criminal proceeding to be initiated against plaintiff, even though there was no probable cause for an arrest or prosecution

in this matter.  The individual defendants maliciously caused this prosecution to be initiated in that they knew there was no probable cause for such prosecution and that they further wished to harm and punish plaintiff for illegitimate reasons, including but not limited to their intent to discriminate against plaintiff on the basis of his viewpoint and the contents of his speech.  The criminal case against plaintiff was terminated in his favor in that all charges were dismissed in their entirety due to the facial insufficiency of the accusatory instrument and the government's failure to prosecute the case. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his rights under the Fourth and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

78. As a result of the foregoing, plaintiff was deprived of his liberty, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### THIRD CLAIM FOR RELIEF
### ABUSE OF PROCESS
### FIFTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983

79. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

80. By the conduct and actions described above, defendants employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm the plaintiff without economic or social excuse or justification, namely, they intended to retaliate against plaintiff for the contents and viewpoint of his speech. The defendants were also seeking a collateral advantage or corresponding detriment to the plaintiff, which was outside the legitimate ends of the process. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to

plaintiff and violated his rights under the Fourth and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

81. As a result of the foregoing, plaintiff was deprived of his liberty, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FOURTH CLAIM FOR RELIEF
### RETALIATORY ARREST
### FIRST AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983

82. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

83. By the actions described above, defendants arrested plaintiff in direct retaliation for both the contents and viewpoint of plaintiff's speech, and they did so without having probable cause to arrest plaintiff for any offense. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his rights under the First and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

84. As a result of the foregoing, plaintiff was deprived of his liberty, was forced to cease giving his speech, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

### FIFTH CLAIM FOR RELIEF
### DENIAL OF DUE PROCESS
### FIFTH AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983

85. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

86. NYCPL § 140.20(7) states as follows:

> Upon arresting a person, other than a juvenile offender, for any offense without a warrant, a police officer *shall*, *upon the arrested person's request*, permit him or her to communicate by telephone provided by the law enforcement facility where the defendant is

> held to a phone number located in the United States or Puerto Rico, for the purposes of obtaining counsel and informing a relative or friend that he or she has been arrested, ***unless granting the call will compromise an ongoing investigation or the prosecution of the defendant***.

NYCPL § 140.20(7) (emphasis added).

87. By placing substantive limitations on an officer's discretion pertaining to telephone calls, the State of New York has created a protected liberty interest in an arrestee's right to communicate with the outside world.

88. Nevertheless, the individual defendants repeatedly denied plaintiff access to a telephone despite his repeated requests, resulting in mental anguish and concern as his wife did not know of his whereabouts. This refusal to permit meaningful access to a telephone is manifestly unjust given the mandatory language in the statute and given the foreseeability that the refusal would result in the harms which the statute sought to prevent.

89. Here, no reasonable officer could have believed that allowing plaintiff to make a phone call upon request would "compromise an ongoing investigation or prosecution" of plaintiff.

90. Further, even if an officer actually did believe that allowing plaintiff to make a phone call would "compromise an ongoing investigation or prosecution," plaintiff was not given a pre-deprivation or post-deprivation hearing to contest that finding.

91. Moreover, to the extent there is an NYPD policy, practice or custom that only an arrestee's actual arresting officer can allow that arrestee to use the telephone, that policy, practice or custom directly caused the officer-defendants to violate the plain terms of NYCPL § 140.20(7), thereby depriving plaintiff of his due process rights.

92. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his rights guaranteed by the Fifth and Fourteenth Amendments, as secured through 42 U.S.C. S 1983.

**SIXTH CLAIM FOR RELIEF**
**FAILURE TO INTERVENE**
**FIRST, FOURTH, FIFTH, FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

93. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

94. Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency falsely arresting a civilian, particularly when such an arrest is made in retaliation for protected activity.

95. Defendants P.O. DOE 2, P.O. DOE 3, and P.O. DOE 4 were present for the above-described incident and witnessed other defendants, *to wit*, P.O. CLEMENS and SUPERVISORY OFFICER DOE 1, unlawfully arrest plaintiff without probable cause and in retaliation for both the contents and viewpoint of his speech.

96. The arrest of plaintiff and the initiation of criminal charges against him was clearly without probable cause or other legal justification, and was based on facts alleged by defendant P.O. CLEMENS which the other individual defendants knew to be false, yet all of the other individual defendants failed to take any action or make any effort to intervene, halt or protect plaintiff from being unlawfully and wrongfully arrested and prosecuted.

97. The individual defendants' violations of plaintiff's constitutional rights by failing to intervene in other defendants' clearly unconstitutional arrest resulted in the injuries and damages set forth above.

**SEVENTH CLAIM FOR RELIEF**
**SUPERVISORY LIABILITY FOR DEPRIVATION OF RIGHTS**
**FIRST, FOURTH, FIFTH, FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

98. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

99. By failing to remedy the wrongs committed by his or her subordinates, in failing to properly train, screen, supervise, or discipline his or her subordinates, and by personally participating in the constitutional injuries set forth above, defendant SUPERVISORY OFFICER DOE 1 caused damage and injury in violation of plaintiff's rights guaranteed under the First, Fourth, Fifth and Fourteenth Amendments, as secured through 42 U.S.C. § 1983.

100.  As a result of the foregoing, plaintiff was deprived of his liberty, was forced to cease giving his speech, suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**EIGHTH CLAIM FOR RELIEF**
***MONELL* CLAIM AGAINST DEFENDANT CITY**
**FIRST, FOURTH, AND FOURTEENTH AMENDMENTS THROUGH 42 U.S.C. § 1983**

101.  Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

102.  All of the acts and omissions by the individual defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

103.    Defendant CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the individual defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

104.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

105.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a.   Applying an unconstitutionally vague and speech-restrictive interpretation of Penal Law § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic, when arresting persons are engaged in activity protected by the First Amendment, even where the alleged blockage of traffic is either brief and fleeting or entirely non-existent; and

    b.   Failing to supervise, train, instruct and discipline police officers about the lawful scope of Penal Law § 240.20(5), both on its face and as applied to activity protected by the First Amendment.

106.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a.   ***Garcia v. Bloomberg***, 11-CV-6957 (JSR) (S.D.N.Y.). The *Garcia* plaintiffs represent a putative class of approximately 700 people arrested on the Brooklyn Bridge roadway as part of a march associated with the Occupy Wall Street movement. As the demonstrators marched over the pedestrian path of the Brooklyn Bridge, pedestrian traffic began to bottleneck near the entrance. In what initially appeared to be an effort to alleviate the bottleneck, NYPD officers led a group of marchers onto the vehicular roadway of the Bridge, then used orange netting to close off the entrance, thereby trapping the demonstrators on the Bridge. Despite obviously lacking the requisite intent or recklessness required under statute, and despite having themselves escorted the demonstrators onto the vehicular roadway, all of the demonstrators on the roadway were arrested and charged with violating Penal Law § 240.20(5).

    b.   ***Long v. City of New York***, 11-CV-5125 (SAS) (S.D.N.Y.); Colin Moynihan, *Judge to Police: Relax About the "Weed Man,"* N.Y. Times, Dec. 20, 2011, at A32. Joshua Long was repeatedly arrested in Manhattan while lawfully begging and promoting

tolerance of marijuana use and marijuana users. Mr. Long would regularly stand on a sidewalk, conscious of staying out of pedestrians' way, and hold a sign reading, "Help! I Need Money for Weed!" Even during the times Mr. Long was not arrested or issued a summons for violating Penal Law 240.20(5), he was regularly ordered by police to "move along" on the pretext he was allegedly blocking pedestrian traffic when, in fact, he was doing no such thing. Mr. Long moved for a preliminary injunction, a motion which was resolved when Mr. Long and the CITY entered into a stipulation, approved by this Court, which read:

> Defendant the City of New York, shall make best efforts to ensure that all New York City Police Department officers assigned to patrol within the territorial boundaries of the Midtown North or Midtown South Precincts (the "Area") will not order, direct, or otherwise communicate to plaintiff Joshua Long that he must move along, leave, vacate, disperse, or otherwise remove himself from the area when he is standing lawfully and peacefully on a public sidewalk, holding a sign or otherwise communicating with passersby. The City of New York's best efforts shall include, without limitation, ensuring that the substance of this Order is communicated to all officers that work in the Area.

(*See* Docket Entry No. 31, Stipulation and Order dated December 19, 2011).

c. ***Hardeman v. City of New York***, 11-CV-3424 (RJH) (S.D.N.Y.); Colin Moynihan, *After Panhandler Says Police Harassed Her, a Judge Tells Them to Stop*, N.Y. Times, Aug. 30, 2011, at A18. The plaintiff in *Hardeman* was repeatedly arrested on Fifth Avenue and charged with violations of Penal Law § 240.20(5) in response to her passive panhandling activity. Evidence submitted in support of Ms. Hardeman's application for a temporary restraining order and preliminary injunction against further arrests showed that, when she panhandled on Fifth Avenue, she occupied a mere 20 inches of a 16 foot wide sidewalk, which is only 5.2% of the width of the sidewalk. (*See* Affidavit of Sojourner Hardeman, Docket Entry No. 14-1). As a result of the Hardeman litigation, the Court approved of a stipulation which resolved the TRO application, as follows:

   i. The NYPD agreed to re-train members of the Midtown North Precinct by reading the following command at roll call several times per week for several weeks: "The Department reminds you that… New York Penal Law 240.20(5) requires a ***real*** obstruction of vehicular or pedestrian traffic." (*See* Docket Entry No. 17) (emphasis added).

   ii. The City of New York agreed not to arrest or issue a summons to Ms. Hardeman "absent probable cause that she has engaged in criminal activity or committed a criminal offense or violation." (*Id*.)

Given that the City of New York had a pre-existing obligation not to arrest Ms. Hardeman without probable cause, the stipulation resolving the TRO application is a tacit acknowledgment the NYPD had repeatedly misapplied Penal Law § 240.20(5)

against Ms. Hardeman as she engaged in passive panhandling, an activity which is clearly protected by the First Amendment.

d. ***Reshke v. City of New York***, 11-CV-2198 (AKH) (S.D.N.Y.); ***Ferracane v. City of New York***, 11-CV-6992 (AKH) (S.D.N.Y.). Members of the NYPD's Gang Intelligence Unit made scores of arrests at the 2010 Puerto Rican Day Parade of persons engaged in First Amendment activity by gathering and celebrating their cultural heritage in New York's largest annual parade. The police made these arrests upon the pretext such persons were blocking pedestrian traffic at the parade and for the sole purpose of interrogating the arrestees about suspected links to local gang activity. All fourteen of the *Reshke* and *Ferracane* plaintiffs had their criminal charges dismissed, most of them on the grounds of the facial insufficiency of the allegations to support a charge of Penal Law § 240.20(5).

e. ***Acevedo v. City of New York***, 10-CV-514 (HB) (S.D.N.Y.). Same as *Reshke* and *Ferracane*, except the eight *Acevedo* plaintiffs were arrested at the 2009 Puerto Rican Day Parade.

f. ***Callaghan v. City of New York***, 07-CV-9611 (PKC) (JLC) (S.D.N.Y.). All of the *Callaghan* plaintiffs were arrested, some of them multiple times, in retaliation for their participation in Critical Mass bicycle rides on the last Friday of every month, activity which this Court has held is expressive conduct within the meaning of the First Amendment. Many of the *Callaghan* plaintiffs were arrested while lawfully riding their bicycles on City streets, and many of those people were charged with violating Penal Law § 240.20(5). The *Callaghan* plaintiffs alleged that they could not have been "blocking" traffic because, as cyclists obeying relevant traffic laws, they ***were*** traffic.

g. ***Dunlop v. City of New York***, 06-CV-0433 (RJS) (S.D.N.Y.). The plaintiff in the *Dunlop* matter was arrested while observing arrests of Critical Mass bicycle riders (*see supra*) during the 2004 Republican National Convention and was charged with violating Penal Law § 240.20(5), despite the fact there was no traffic at all around him at the time of his arrest. The act of observing arrests occurring in public is activity protected by the First Amendment, yet the police disregarded Mr. Dunlop's rights and wrongfully arrested him even though there he was not even arguably blocking vehicular or pedestrian traffic.

h. ***MacNamara v. City of New York***, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.). The *MacNamara* plaintiffs' cases were consolidated from no less than 44 civil cases related to the over 1800 arrests at the 2004 Republican National Convention. Nearly all of the *MacNamara* plaintiffs were engaged in lawful activity protected by the First Amendment, but, despite that fact, hundreds of them were arrested for violating Penal Law § 240.20(5) when they were not actually blocking any traffic whatsoever. *See MacNamara v. City of New York*, 275 F.R.D. 125, 135 (S.D.N.Y.2011).

107.    The allegations in the above-referenced matters are hereby incorporated by reference into the complaint.

108.    The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Raymond Kelly.

109.    All of the foregoing acts by defendants deprived the plaintiff of federally protected rights, including, but limited to, the constitutional rights enumerated in paragraphs "73" through "100" above.

110.    Defendant CITY knew or should have known that the acts alleged herein would deprive the plaintiff of his rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

111.    Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner KELLY, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

112.    The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the individual defendants felt empowered to arrest plaintiff

for violating Penal Law § 240.20(5) even where it was obvious he was doing nothing that would constitute the blocking of pedestrian traffic and where it was also obvious he was engaged in activity protected by the First Amendment. Pursuant to the aforementioned CITY policies, practices and/or customs, defendants failed to intervene in or report other defendants' violation of plaintiff's rights.

113.    Plaintiff's injuries were a direct and proximate result of the defendant CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers in meaning and lawful scope of Penal Law § 240.20(5), particularly where applied to activity protected by the First Amendment.

114.    Defendants, collectively and individually, while acting under color of law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the plaintiff's constitutional rights.

115.    As such, the CITY's policies, practices, omissions and failures described above were the moving forces behind the violations of plaintiff's constitutional rights.

## JURY DEMAND

116.    Plaintiff demands a trial by jury in this action on each and every one of his damage claims.

    ***WHEREFORE***, plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

a.    That he be compensated for violation of his constitutional rights, pain, suffering, mental anguish, and humiliation; and

b.    That he be awarded punitive damages against the individual defendants; and

c.    That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d.      For such other further and different relief as to the Court may seem just and proper.


Dated:          New York, New York
                February 23, 2012


                                        Respectfully Submitted,

                                        /s/
                            By:         _____
                                        David B. Rankin
                                        Robert M. Quackenbush
                                        Law Office of Rankin & Taylor
                                        *Attorneys for the Plaintiff*
                                        350 Broadway, Suite 701
                                        New York, New York 10013
                                        t: 212-226-4507